# BOARD OF LIQUIDATION OF NEW ORLEANS *v.* LOUISIANA.

# DRAINAGE COMMISSION OF NEW ORLEANS *v.* WILDER.

**ERROR TO THE SUPREME COURT OF THE STATE OF LOUISIANA.**

Nos. 114, 119. Argued December 4, 5, 1900.—Decided January 7, 1901.

Without implying that the reasoning of the state court by which the conclusion was reached that under the statute of Louisiana both the Board of Liquidation and the Drainage Commission occupied such a fiduciary relation as to empower them to assert that the enforcement of the provisions of the constitution of the State would impair the obligations of the contracts entered into on the faith of the collection and application of the one per cent tax, and of the surplus arising therefrom, this court adopts and follows it, as the construction put by the Supreme Court of the State of Louisiana on the statutes of that State, in a matter of local and non-Federal concern.

The proposition that the judgment of the Supreme Court of the State of Louisiana rests upon an independent non-Federal ground, finds no semblance of support in the record.

Considering the many, and in some respects ambiguous statutes of the State of Louisiana, this court concludes, as a matter of independent judgment, that the contract rights of the parties were correctly defined by the Supreme Court of that State.

This court's affirmance of the judgment below is without prejudice to the right of the Board of Liquidation and the Drainage Commission to hereafter assert the impairment of the contract right which would arise from construing the judgment contrary to its natural and necessary import, so as to deprive the Board of Liquidation of the power, in countersigning the bonds, to state thereon the authority in virtue of which they are issued.

IN 1890 the legislature of Louisiana enacted a law for the refunding or retirement of certain outstanding debts of the city of New Orleans, and for the further carrying out of a plan, relating to a portion of the city debt, known as the Premium Bond Plan. The act specified the debts to be refunded or retired, and provided moreover substantially as follows:

The Board of Liquidation of the City Debt, which we shall

hereafter refer to as the Board of Liquidation, which had been created by previous laws, in addition to the powers which it already possessed, was made a corporation and was authorized to execute the refunding law. The city was directed to deliver to the Board of Liquidation municipal bonds not exceeding in amount ten millions of dollars, the series to be known as the " Constitutional Bonds of the City of New Orleans." The Board of Liquidation was directed to countersign and issue as many of these bonds as might be required for the refunding or retiring operations. To pay the interest on the bonds and to provide for a sinking fund, which the law directed should be accumulated, as well as for the execution of its other provisions, a special ad valorem tax of one per cent was directed to be levied by the municipality annually, upon all the taxable property within the city of New Orleans until " the principal and interest of the bonds herein provided to be issued are fully paid." The proceeds of this tax were directed to be paid over to the Board of Liquidation day by day as collected, and the city was deprived of all control over or custody of the avails of the tax, the disbursement thereof being solely vested in the Board of Liquidation subject to its duty to account to the city for the expenditure. It was recited (sec. 16) " that all of the substantial provisions of this act are hereby declared to be a contract between the State of Louisiana, the city of New Orleans, the taxpayers of said city, and each and every holder of the said constitutional bonds." The law, (sec. 8,) after limiting the purposes to which the funds arising from the one per cent tax should be primarily disbursed by the Board of Liquidation, contained the following :

" After making, in each year, the provisions above required, and after deducting the expenses incurred by such board, and after paying any deficiency in the interest fund of any previous year, one half of the surplus of said tax shall be passed to the credit of a special fund, to be known as the 'permanent public improvement fund,' to be disposed of as hereinafter provided. The other half of said surplus shall be paid over to the school board of the city of New Orleans, in addition to any fund ap-

propriated by said city out of other funds, to be used in the maintenance and support of the public schools in said city."

It was further provided (sec. 10):

"That, the permanent public improvement fund, above provided for, shall be used exclusively for the construction of permanent public improvements in the city of New Orleans, such as levees, canals, drainage stations, pavements, public buildings, public parks and bridges, and an ordinance passed by the said council to be paid out of this fund, shall first be approved by said Board of Liquidation, who shall not draw any check on said fund unless they are convinced, upon proper inquiry, that said ordinance covers the construction of a permanent public improvement within the purview of this act. The true intent and meaning of this clause is not to give said board any authority to say to what permanent public improvement any fund shall be applied, but only to see that said funds shall be applied exclusively to the construction of improvements that are permanent."

The constitution of the State of Louisiana, at the time the foregoing law was passed, contained restrictions upon the authority both of the legislature and the city of New Orleans, with which many of the provisions of the refunding law were in conflict. It was consequently provided that the main provisions of the law should not go into effect until they were ratified by the adoption of a constitutional amendment, which was submitted by an act passed at the same session at which the refunding law was adopted. This amendment to the constitution was ratified at a general election in 1892. The amendment to the constitution, however, was not solely confined to an approval of the refunding act, but contained a provision empowering the city of New Orleans " to examine into and assume the payment of the claims or obligations of the board of school directors for the city and parish of Orleans due for the years 1880, 1881, 1882, 1883 and 1884, now in the hands of original owners, who have in nowise parted with their rights of ownership, or pledged the same, as may be found to be equitably due by said board for services rendered, labor performed or materials furnished by authority of said board." The power of the

city to exercise the discretion thus conferred depended upon the
adoption of the amendment to the constitution because the
school board was a distinct corporation from the city of New
Orleans, and its debts were not debts of the city; and without
the amendment the legislature could not have empowered the
city to assume to pay a sum which it did not owe, because the
amount was solely due by another and distinct corporation.

After the adoption of the amendment the city of New Orleans
contracted for various works of public improvement, and the
cost of these works, it was either expressly or impliedly agreed,
should be paid out of the permanent public improvement fund,
to arise from one half the surplus of the one per cent tax, as
provided in the amendment of 1892 and the refunding law.

In July, 1895, a plan for the drainage of the city of New Or-
leans was devised by the municipality. In 1896 a law was en-
acted creating the Drainage Commission of New Orleans, with
authority to execute the aforestated plan of drainage, with such
modifications as might be deemed necessary for its successful
accomplishment. The law provided (sec. 6) in order "to raise
funds for the purpose of doing such work speedily and on an
extensive scale, said Drainage Commission of New Orleans shall
have power to issue and dispose of its negotiable bonds to an
amount not exceeding five millions of dollars. . . . All
moneys and funds dedicated and applied by this act to the pur-
poses thereof are consecrated to the payment of the principal
and interest on said bonds." The funds thus referred to were
enumerated in the act (sec. 3) and consisted of the moneys in
the hands of the Board of Liquidation derived from one half the
surplus of the one per cent tax levied after January 1, 1898. In
other words, as the city had prior to 1896 contracted for public
improvements payable out of the surplus, so much of the surplus
fund as accrued from taxes levied prior to January 1, 1898, was
not transferred to the Drainage Commission, but was left to be
applied to the discharge of the sum due on the contracts which
the city had theretofore made on the faith of the surplus fund.
In addition, the act also "dedicated and applied" to the pur-
poses of the Drainage Commission "all moneys and funds now
under the control of the city of New Orleans, and hereafter to

be received, arising from the sale of street railroad franchises and other franchises." In 1898 the law just referred to was amended in various particulars, one of these amendments reducing the amount of bonds which the Drainage Commission was authorized to issue from five millions to fifteen hundred thousand dollars.

The Board of Liquidation received from the city of New Orleans the series of ten millions of constitutional bonds and sold or otherwise issued $8,998,500 thereof, leaving in its hands bonds amounting to $1,001,500. There yet remained, however, certain outstanding debts subject to be refunded or retired, amounting to about $137,050.

The Drainage Commission, as it was authorized to do, caused to be prepared fifteen hundred bonds of $1000 each. Five hundred of these bonds were sold in June, 1898, realizing $505,238. There was paid over to the commission the proceeds of the sale of certain street railroad franchises, amounting to $579,582.12. Between May, 1897, and the 12th of May, 1898, the commission made contracts for the work of draining the city to the amount of $1,834,465.35, and prior to May 12, 1898, had paid on account of these contracts, as the work progressed, $797,363.06, leaving due the sum of $1,037,102.29, which was payable as the work proceeded.

In 1896 a convention to frame a new constitution for the State of Louisiana was assembled, and the instrument which that body adopted was, subsequent to May 12, 1898, declared to be the constitution of the State without submitting the provisions thereof for ratification by a vote of the people. By article 314 of this constitution the constitutional amendment adopted at the election of 1892, relating to the retirement or the refunding of the city debt, was reiterated. The discretion, however, which had been conferred upon the municipal government of the city of New Orleans by the constitutional amendment of 1892, to assume payment of certain claims against the school board, apparently not having been availed of, article 315 of the new constitution imposed a positive duty on the city to examine specified debts due by the school board, and to issue certificates of indebtedness to the amount found to be due.

These debts the constitution provided for in article 317, as follows: " The funds requisite to pay said claims shall be provided by said Board of Liquidation, by the sale of a sufficient number of the constitutional bonds of the city of New Orleans of the issue provided for by act number 110 of the general assembly for the year 1890, and by the amendment to the constitution of the State submitted to the people by said act and adopted at the general election in 1892."

The city of New Orleans ascertained the amount of the claims to be $115,558.33, and issued certificates as required by the constitution. . The Board of Liquidation, refusing to sell bonds for the payment of the certificates, proceedings by mandamus to compel it to do so were commenced. The return of the Board of Liquidation to the alternative rule for mandamus denied the right of the relators to the relief by them prayed, for various reasons based upon purely local and non-Federal contentions, to which we need not refer. The return thereupon specially set up and claimed that the carrying out of article 317 of the new constitution, by selling any of the constitutional bonds to provide the funds to pay the debt of the relators, would bring about an impairment of the obligations of certain contracts, and therefore would cause the article of the constitution to be repugnant to section 10, article I, of the Constitution of the United States. The return besides alleged that the sale of the bonds, as required, would deprive the contract creditors of their property without due process of law, in violation of the Fourteenth Amendment of the Constitution of the United States. The grounds upon which the protection of the Constitution of the United States was invoked were stated in the return with much elaboration; all the averments on this subject, however, are reducible to the following:

First. That under the powers conferred upon it the respondent board was qualified in every respect to enforce the rights of all the bondholders and of each and every person having a contract claim to any portion of the one per cent tax.

Second. That as the refunding law and the amendment to the constitution of 1892 had authorized a series of constitutional bonds to be issued solely for certain specified debts, the sale of

any such bonds, as required by the provision of the new con-
stitution, to pay debts other than those originally contemplated,
would impair the obligations of the contracts which had arisen
from the refunding law and amendment of 1892 in favor of
those to whom the constitutional bonds had already been issued,
and would also impair the obligation of the contract in favor
of the premium bondholders and other creditors who had not
exchanged their claims for bonds of the constitutional series.

Third. That as the surplus of the one per cent tax had been
directed to be applied, one half to the school board and the
other half to a permanent public improvement fund, the issue
of bonds payable out of the one per cent tax for any other
debts than those originally contemplated would necessarily, to
the extent of such issue, increase the payments to be made out
of the one per cent tax, and therefore diminish the sum of the
surplus. That this decrease in the amount of the surplus would
impair the obligations of the contracts existing in favor of the
following classes of creditors : First, those who had contracted
with the city to execute certain works of public improvement
on the faith of the surplus. Second, those bondholders who
had taken the five hundred thousand dollars of bonds issued by
the Drainage Commission upon the faith of the surplus fund.
Third, those who had contracted with the Drainage Commission
in reliance upon the surplus fund. The return in addition al-
leged that the sale of the bonds as prayed would injuriously
affect the sale by the Drainage Commission of the million dol-
lars bonds which that board had not yet disposed of, and there-
fore would further impair the obligation of the contracts ex-
isting in favor of all the creditors of the Drainage Commission,
as such creditors had contracted with the commission upon the
faith of the undiminished and unimpaired power to sell the
bonds as originally provided for. It was besides alleged that
as one half of the surplus had been consecrated to the school
board, the diminution of the surplus which would be occasioned
by the sale of bonds for any other debts than those originally
provided for would impair the obligations of the contract which
had been engendered in favor of the school board as the result
of the provision dedicating the one half of that surplus to that
board.

The Drainage Commission intervened in the cause, and after asserting its right to protect its own interest so far as the further issue of bonds was concerned, and to champion the interest of those to whom bonds had been issued and with whom contracts had been made, specifically charged that the provision of the new constitution was in violation of the contract clause of the Constitution of the United States and the Fourteenth Amendment upon grounds substantially identical with those which had been alleged in the return of the Board of Liquidation.

After hearing, the trial court dismissed the intervention of the Drainage Commission, because it concluded that the commission had no capacity to stand in judgment for the purpose of protecting either its own right to further issue bonds or in order to protect the rights of the holders of drainage bonds already issued, and those who had contracted to do the drainage work. On the merits, the trial court held that the return made by the Board of Liquidation was insufficient, and it therefore allowed a peremptory mandamus commanding the Board of Liquidation to sell a sufficient quantity of the constitutional bonds to provide the means for paying the sum of the certificates held by the relators, with five per cent interest thereon from the date of the application for mandamus. Both the Board of Liquidation and the Drainage Commission prosecuted appeals to the Supreme Court of the State of Louisiana.

That court, in deciding the appeals, delivered an elaborate opinion. After holding that the school board was a distinct corporation from the city of New Orleans, and, therefore, the debts of the school board were not those of the city, the court determined that it was within the power of the constitutional convention to impose the duty on the city of assuming debts of a different corporation. Having reached this conclusion, the court approached the consideration of the power of the convention to direct the Board of Liquidation to sell a sufficient number of constitutional bonds to pay the debt thus assumed. It considered this question, first, from the aspect of the authority of the convention over the Board of Liquidation and the Drainage Commission, without reference to the limitations im-

posed by the contract clause of the Constitution of the United States, and then passed on the question of contract and its impairment. In the first aspect, it was decided that as the Board of Liquidation and the Drainage Commission were but creatures of the lawmaking power of the State, both these bodies were subject to and controlled by the imperative command of the constitution. That, albeit by the original act of refunding and the amendment which ratified it, the bonds of the constitutional series were only to be issued for particular classes of debt, a subsequent constitutional requirement that certain of the bonds should be sold to pay another class of debts was paramount, and, therefore, must be obeyed by the Board of Liquidation. It was held that although the Drainage Commission, by the act creating it, was empowered to execute a general plan of drainage for the city of New Orleans, its duty in this regard was subject to future control, and hence that it was within the power of a subsequent legislature to modify or wholly suspend the drainage work by discontinuing the duties of the board, and, *a fortiori*, it was within the power of the constitutional convention to bring about the same result. Having established this premise, the learned court reached the conclusion that, even although the future execution of the drainage work, under the plan originally conceived, might be wholly impeded or seriously diminished by making other charges against the surplus than those originally contemplated, nevertheless it was the duty of the board to comply with the state constitution, because whether or not the drainage work should be continued as first designed was a question of public policy, which the convention had a right to determine.

Whilst laying down the foregoing, when the court considered the question of the alleged impairment of contract rights, it held that the propositions which it had previously announced were all qualified and restrained by the contract clause of the Constitution of the United States, and therefore the provision of the constitution requiring the sale of the bonds to produce the funds to pay the school debt would be relatively void if it conflicted with or impaired the contract rights of the following classes of creditors, viz : The holder of the constitutional and of

the premium bonds; those who 'held debts subject to be funded into constitutional bonds, but who had not yet exercised such right; those who had contracted with the city for works of public improvement on the faith of the surplus; those who held the drainage bonds issued by the Drainage Commission; and finally those who had contracted with that commission prior to the adoption of the constitution.

In coming to consider the question of impairment the court declared that the contract which had arisen with the holders of the constitutional bonds was that no 'bonds of that series should be issued for any other than the debts specified in the refunding and retiring act and in the constitutional amendment of 1892; that the surplus- fund contemplated by the act and the amendment was not simply the surplus arising after apply- ing the one per cent tax to the payment of a ten million issue of bonds, but was the surplus which might arise from the ap- plication of the one per cent tax to the payment of such amount of the ten million issue as had been and would be from time to time required in the refunding or retiring of the debts specified in the act and amendment. It was therefore decided that the sale of any bonds of the series for the purpose of paying any other debts than those specified and originally contemplated would impair the obligation of the contract creditors having a right to payment out of the one per cent tax and of the con- tract creditors having a right to be paid out of the surplus fund. This impairment, however, it was held could only arise in the event the payment of the bonds provided to be sold to pay the school debts assumed by the city interfered in any way with the funds required to discharge the claims of the contract cred- itors as above stated. But such interference, the court held, did not and could not arise, inasmuch as the bonds which the constitution provided should be sold would be, when issued by the Board of Liquidation, subordinate to all the contract rights above stated. That is to say, that it was the duty of the Board of Liquidation to sell the bonds, but that when issued they would not be entitled to payment out of either the one per cent tax or the surplus fund, until all the contract rights had been provided for, as above enumerated. Indeed, it was held that

if it was necessary for the Drainage Commission to sell the bonds which it was authorized to issue for the purpose of paying for the work contracted for prior to the adoption of the constitution, that these drainage bonds when thus sold would also be entitled to a priority of application of the surplus of the one per cent tax before any part thereof could be used to pay the bonds which the Board of Liquidation was directed to sell for the purpose of the retirement of the school certificates.

Whilst it was thus decided that the bonds to be sold for the school purposes would be subordinate to all the contract rights, and therefore, in the nature of things, could not interfere with or impair such contract rights, the bonds in question were yet declared by the court to be entitled to be paid out of any of the surplus fund which might remain after the discharge of the contract claims, with the preference over any rights which might arise from contracts made by the Drainage Commission after the adoption of the new constitution for the further execution of the drainage plan. This being predicated upon the conclusion that the state constitution, whilst it could not impair contract rights, could yet lawfully diminish or change the plan of drainage in so far as its future execution was concerned. In the margin[1] are excerpts from the opinion of the Supreme

[1] At page 1870 the court said:

"Defendants assume that the mere fact that constitutional bonds should be sold for the purpose of paying the certificates held by relators or should be given in exchange for those certificates, would of necessity entitle the holders of such bonds to prime the holders of permanent bonds, bonds drawn against the 'surplus' of the one per cent tax dedicated to permanent public improvements, and also to necessarily come in on a footing of equality with all the other holders of consolidated bonds, and they maintain, if this be true, the rights of contract creditors under the funding act, would be impaired.

"Relators on the other hand insist that the only portion of the one per cent tax ever set aside for permanent public improvements was one half of the surplus produced by the tax which would remain after having retained in the hands of the Board of Liquidation enough to meet the payment in full of a ten million issue of consolidated bonds, and that, therefore, it would be legally immaterial to creditors basing contracts on such surplus, to whom the other portion of the fund would go; it would be enough for them to know it would not go to them, and relators urge that other holders

Court of Louisiana, (51 La. Ann. 1849,) which more elaborately state the conclusions which we have above summarized.

---

of consolidated bonds would have no ground of complaint; that they should be permitted to share equally with them from the tax fund, as they had accepted their bonds on the expected basis of coming in concurrence with an issue of ten millions of bonds; that they might be interested that the limit as to the amount of the bonds should not be passed, but that they were without legal interest, when the limit should not have been passed, as to who should be the holders of the bonds sharing the fund with them.

"In support of this last position they rely upon the decision of the Supreme Court of the United States in *Board of Liquidation* v. *McComb*, 92 U. S. Reports, 531. If the collection of the one per cent tax would suffice to pay each year the holders of consolidated bonds issued in taking up or retiring the bonds and claims such as were provided for by the Act No. 110 of 1890, and the constitutional amendment of 1892, without any conflict with the bonds, ordered to be sold by Article 317 of the constitution of 1898, the former, of course, would have no cause of complaint, but if from any cause the amount of tax collected would be insufficient for that purpose, we do not think the holders of these latter bonds could force the former to prorate with them the amount in hand.

"This condition of things is not existing. It may never arise, and should it arise, the Board of Liquidation would doubtless have taken steps to distinguish bonds issued under Article 317 from those which had been otherwise issued."

Again the court said (ib. p. 1872):

"There is no constitutional objection to the convention's ordering the Board of Liquidation to sell bonds to take up the relators' certificates, but there would be constitutional objection to be urged if the effect of the issuing of such bonds would be to place the holders thereof on an equality with the holders of bonds issued to take up the bonds and claims provided for as to their funding and payment by Act No. 110 of 1890, Act No. 114 of 1896, and the constitutional amendment of 1892. *Duperier* v. *Police Jury*, 31 Ann. 710; *Shields* v. *Pipes*, 31 Ann. 765."

Yet further, in analyzing the rights of the drainage bondholders and contract creditors, the court said (ib. p. 1875):

"We do not take the same view that relators do as to what was meant and intended to be conveyed by the 'surplus' referred to by Act 110 of 1890, Act 114 of 1896, and the constitutional amendment of 1892. We think the lawmakers intended that any portion of the one per cent tax provided for in Act 110, not needed for the payment or retirement of the particular bonds or claims therein specially provided for as to payment or retirement, should constitute the surplus of the tax. That it was not contemplated when these laws were passed, or the amendment of 1892 adopted, that in order to exhaust any portion of the ten millions of dollars originally expected to be needed to pay the existing bonds and the existing claims therein

And all the views which the court expounded were based on a ruling by it made that the Board of Liquidation, under the

---

specially enumerated, which might not be necessary for the purpose, new classes of claims should or would be thrown under the provisions of the original funding law.

"We think the 'surplus' was intended to connect at once and follow immediately behind as to its appropriation the amount beyond that actually needed to carry out the plan as originally mapped out and planned. The surplus was provisionally ascertained each year in a manner particularly specified to be readjusted the next in a manner also particularly specified. All the surroundings and circumstances connected with the legislation negative the idea that the surplus mentioned was to be only any surplus over ten millions of dollars which might result from the collection of the one per cent tax.

"We think the Board of Liquidation, the Drainage Commissioners, and those with whom they contracted were justified in placing that interpretation upon the legislation, and that the contract rights based upon the same should be protected from impairment. The convention, while ordering the payment of the certificates held by the relators, through sales of consolidated bonds, could not confer upon the holders of such bonds rights which in any way would come in competition with the contract rights of creditors existing against the tax at the time of the adoption of the constitution. Though there was no mention in the constitution as to the rank of the bonds which would be issued to take up relators' certificates, that rank resulted from legally existing conditions which could not be constitutionally interfered with."

Summing up its conclusion, the court declared (ib. p. 1873):

"The consolidated bonds which relators seek to have issued upon their prayer will really be drawn against (when issued) any surplus which will remain of the one per cent tax after the payment of all the bonds issued and to be issued by the Board of Liquidation, under Act No. 110 of 1890, and the constitutional amendment of 1892, in order to fund and retire and pay the bonds and debts therein specially enumerated, and also the bonds issued and to be issued by the Drainage Commission under the provisions and authority of Act No. 114 of 1896, to pay the contracts existing at the date of the adoption of the constitution, which were entered into upon the faith of the surplus directed to be set aside to the credit of the permanent improvement fund by the Act No. 110 of 1890, Act No. 114 of 1896, and the constitutional amendment of 1892.

"The effect of this will be to subordinate the rights of holders of bonds issued by the Drainage Commission to pay for contracts entered into after the adoption of the constitution of 1898 to those of the holders of consolidated bonds to be issued under the orders of article 317 of the constitution of 1898. This may check and impede the work of public improvement, but it is a matter which we cannot control."

provisions of the statutes of Louisiana, defining the powers of that board, was invested with such a relation to the contract creditors as empowered it to stand in judgment for the purpose of protecting the contracts from impairment, and hence authorized it to plead the defences which it had asserted in its return to the rule for mandamus. The judgment of the trial court was affirmed.

The Board of Liquidation applied for a rehearing mainly on the ground that although the views expressed in the opinion of the court had fully recognized the rights of the contract creditors, nevertheless the decree had deprived the contract creditors of the protection to which the opinion acknowledged they were entitled under the Constitution of the United States. This was on the assumption that as the decree of the trial court directed the issue of bonds according to the refunding act, and the amendment of 1892, therefore a compliance with its commands would compel the board to sell negotiable bonds undistinguishable from the other bonds of the same series, and hence put those thus sold on exactly the same footing as the bonds previously issued.

The Drainage Commission also applied for a rehearing on grounds substantially identical with those urged by the Board of Liquidation, and upon the further contention that an injustice had been done it, since the court although it, in effect, in its opinion, recognized the right of the commission to intervene, had nevertheless affirmed the judgment of the trial court which dismissed the Drainage Commissioners from the cause upon the assumption that it had no capacity to stand in judgment and champion the rights of the creditors. Both the applicants for rehearing complained of the affirmance of the decree below in so far as it directed the payment of interest on the claims of the certificate holders.

The court granted the rehearing to a limited extent, reversed the judgment below in so far as it dismissed the intervention of the Drainage Commission and to the extent that it allowed interest, and in other respects reiterated the affirmance. These writs of error were then prosecuted. At a previous term of

this court, motions to dismiss or affirm were made, and their consideration was postponed to the hearing on the merits.

*Mr. Branch K. Miller* for the Board of Liquidation of the City Debt.

*Mr. Chester J. Théard* for the Drainage Company. *Mr. Arthur McGuirk* and *Mr. Henry L. Lazarus* were on his brief. *Mr. William Wirt Howe* and *Mr. Walker B. Spencer* filed a brief for same.

MR. JUSTICE WHITE, after making the foregoing statement of the case, delivered the opinion of the court.

The motion to dismiss is without colorable support. The contention that as public bodies charged with the performance of ministerial duties, both the Board of Liquidation and the Drainage Commission had not the capacity to plead that the provisions of the state constitution impaired the obligations of contracts in violation of the Constitution of the United States, is foreclosed by the decision of the court below. In that court, as we have said in the statement of the case, the want of capacity in both the bodies to urge the defences in question was expressly put at issue and was directly passed on, the court holding that under the statutes of the State of Louisiana both the bodies occupied such a fiduciary relation as to empower them to assert that the enforcement of the provisions of the state constitution would impair the obligations of the contracts entered into on the faith of the collection and application of the one per cent tax and of the surplus arising therefrom. Without implying that the reasoning by which this conclusion was deduced would command our approval were we considering the matter as one of original impression, and without pausing to note the ulterior consequences which may possibly arise from the ruling of the court below on the subject, we adopt and follow it, as the construction put by the Supreme Court of the State of Louisiana on the statutes of that State in a matter of local and non-Federal concern.

Accepting, then, in this regard, the decision of the state court, the proposition now pressed reduces itself to this: Although under the state law both of the bodies in question bore such a relation to the interests involved as to empower them to assert that the contract rights were impaired, nevertheless they do not possess the capacity to prosecute error to a decision if adverse to the contract rights. This, however, is but to say at one and the same time that there was capacity and incapacity to assert and protect the contract rights. The proposition that the judgment of the Supreme Court of the State of Louisiana rests upon an independent non-Federal ground, finds no semblance of support in the record. It is true the court primarily considered the case from the point of view of the duty and rights of the defendant and intervenor as depending on the law of Louisiana irrespective of the contract rights, but these considerations were by the court declared to be merely a prelude to the decision of the fundamental issue, that is, whether, if the relief prayed was allowed there would arise an impairment of the obligations of the contracts as specifically alleged both in the return made by the Board of Liquidation and in the petition of intervention of the Drainage Commission. Indeed, the opinion of the learned court, which we can consider, *Eagan* v. *Hart*, 165 U. S. 188, expressly announced that the defences asserted under the contract clause of the Constitution of the United States were the real issues and were essentially necessary to be decided in order to dispose of the cause. The argument that no Federal question is presented because the court below awarded to the contract creditors all the rights to which they were entitled, involves the assumption that jurisdiction to review the decision of a state court, disposing of a Federal question, depends upon the conception of the state court or some of the parties to the record as to the correctness of the decision rendered. This in effect denies the power to review a decision disposing of a Federal question in every case where the state court assumes that such question has been by it correctly disposed of. But this necessarily imports that in no case whatever where a state court has decided a Federal question, can review in this court be had, since in every case it must be assumed that a state court of last resort has de-

cided, according to its understanding, the issues presented to it for determination.

On the merits the errors assigned substantially raise all the controversies which were below decided. They hence embrace some subjects not essential to be considered in order to dispose of the Federal question.

The power of the constituent body to direct the Board of Liquidation to sell the bonds and the right to diminish the fund applicable to the drainage of the city of New Orleans, when viewed apart from the contract rights, involve purely local and non-Federal contentions. When the jurisdiction of this court is invoked because of the asserted impairment of contract rights arising from the effect given to subsequent legislation, it is our duty to exercise an independent judgment as to the nature and scope of the contract. Nevertheless, when the contract, which it is alleged, has been impaired, arises from a state statute, as said in *Burgess* v. *Seligman*, 107 U. S. 20, 34, "for the sake of harmony and to avoid confusion, the Federal courts will lean towards an agreement of views with the state courts, if the question seems to them balanced with doubt."

It is indeed disputable as a matter of independent judgment whether the rights of the contract creditors were as broad as the court below held them to be. *Board of Liquidation* v. *McComb*, 92 U. S. 531. Considering the many and in some respects ambiguous statutes of the State of Louisiana which are the sources of the contract rights, and permitting the opinion as to those rights entertained by the Supreme Court of the State of Louisiana to operate upon the doubt which must arise from a review of the statutes alone, we conclude as a matter of independent judgment that the contract rights were correctly defined by the Supreme Court of the State of Louisiana. The question then is, taking the contract rights to be as thus declared, were they substantially impaired by the conclusions reached by the Supreme Court of the State? If the answer to this question is to be deduced from the opinion of that court, a negative response is plainly required, since, in the most explicit terms, the opinion holds that the rights to arise in favor of the purchasers of the bonds which the new constitution directed to

be sold, were subordinate in each and every respect, to all the prior contract rights.  In the nature of things it cannot be said that subsequent rights which are so limited as to prevent them in any degree from interfering with prior ones, can as a matter of legal conclusion be held to impair such previous contract rights.  But it is contended, and this is the controversy most strenuously pressed in the argument at bar, although by the opinion of the Supreme Court of the State of Louisiana the contract rights were protected, the decree of that court in effect brought about the destruction of the identical rights which the opinion held could not be lawfully impaired.  This proceeds on the assumption that as the decree of the trial court which was affirmed directed the Board of Liquidation to sell bonds under the refunding act and constitutional amendment of 1892, it therefore imposed the duty of offering bonds for sale exactly in the form required by the prior legislation without affixing any distinguishing statement to them, thereby causing the negotiable bonds, when sold, to be exactly on the same footing of legal right with those previously used for the purpose of retiring or refunding the debt.  Under the law of Louisiana, it is asserted, the judgment, and not the reasoning used in the opinion of the court, is conclusive, and therefore the result above indicated must necessarily flow from the judgment which is now under review.

We do not stop to examine the Louisiana authorities cited to sustain the abstract proposition relied upon, as we consider the premise from which the contention is deduced to be unsound. It is to be borne in mind that under the act of 1890 and the amendment of 1892 the city of New Orleans was to issue a series of ten millions of bonds, to be placed in the hands of the Board of Liquidation for the retiring and refunding operations, and these bonds, so delivered to the board for the purposes specified, were required to be countersigned and issued by that body before they became complete and perfect evidences of debt against the city.  Now, whilst it is true the mandamus, which was awarded against the board, directed it to sell bonds placed in its hands under the act of 1890, the ground for the allowance of the writ was the duty imposed upon the board to

do so by the new constitution.   Indeed, the opinion of the Supreme Court negatives the assumption that there was any authority conferred on the board to issue the bonds for the school debt by the act of 1890 or the amendment of 1892.   Conceding, *arguendo* only, that there be as contended an exceptional and narrow rule in Louisiana excluding an examination of the pleadings for the purpose of elucidating the scope of a judgment rendered in a given cause—though the opposite doctrine is upheld by this court, *Hornbuckle* v. *Stafford*, 111 U. S. 389, 393—we do not think there is reason for the assertion that the effect of the judgment below is to preclude the Board of Liquidation, when countersigning the bonds in question for the purpose of sale, from affixing to them a statement that they are issued in virtue of the authority of the new constitution and as a result of the command of the Supreme Court of the State.   This being done, beyond peradventure the takers of such bonds would be affected with notice of the legal authority under which they were issued and of the nature of the rights conferred by that authority, and therefore the inconvenience or possible wrong suggested in argument could not in any event arise.   It would be beyond reason to assume that a judgment which commanded the performance of a particular act, because of the existence of a legal duty arising from a specified provision of a state constitution, should be construed as excluding the right and duty to refer in issuing the bonds in obedience to its command to the authority by which alone the power exercised could be brought into play.   Not only does the reason of things require this conclusion, but so also does the respect which we entertain for the learned tribunal below preclude the possibility of our accepting the impossible and contradictory construction of the effect of the opinion and decree advanced in the argument which we are considering.   Of course, if the judgment below was susceptible of the interpretation contended for, in view of the nature of the contract rights as recognized by the Supreme Court of the State and established by the opinion which we have just expressed, it would be our duty to reverse the judgment below rendered.

Our affirmance, however, will be without prejudice to the

right of the Board of Liquidation and the Drainage Commission to hereafter assert the impairment of the contract rights which would arise from construing the judgment contrary to its natural and necessary import so as to deprive the Board of Liquidation of the power in countersigning the bonds to state thereon the authority in virtue of which they are issued.

*Affirmed.*

MR. JUSTICE PECKHAM took no part in the decision of this cause.