SCHIEFELBEIN, Special Administrator, Respondent, vs. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Appellant.

*January 7—March 31, 1936.*

For the appellant there were briefs by *Bender, Trump &
McIntyre* of Milwaukee and *Frank Hanson* of Mauston,
and oral argument by *Rodger M. Trump.*

For the respondent there was a brief by *Loomis & Roswell*
of Mauston, attorneys, and *Grady, Farnsworth & Walker*
of Portage of counsel, and oral argument by *Orland S.
Loomis* and *Walter H. Farnsworth.*

The following opinion was filed February 4, 1936:

NELSON, J. Fred H. Schiefelbein, hereafter called the
decedent, was employed by the defendant for many years
prior to December 11, 1932, the date of his death. He was
concededly an efficient and careful employee. For several
months prior to December 11, 1932, he had served as a
member of a night switching crew in the defendant's yards
at New Lisbon. The switching operation which the crew

was conducting at the time decedent was fatally injured involved the transferring of four cars from defendant's "valley division" train (No. 156) to its Chicago-bound train (No. 56) on the main line. The switching crew consisted of an engineer and fireman of the switch engine, a foreman, a switchman, whose name was Olson, and the decedent. In transferring the cars the following movements and acts were necessary: The switch engine pulled the four cars from the valley-division track to the westbound main-line track and there awaited the arrival of train No. 56. The switch engine at that time was headed west. The car next to the switch engine was the Chicago express car. Behind that car were the Milwaukee baggage car and two Pullmans. The three cars last mentioned were to be attached to the rear of train No. 56 and the Chicago express car to the head of it. Train No. 56 arrived about fifteen minutes late. Upon its arrival the switch engine backed the four cars mentioned over a connecting switch track to the eastbound track and along the latter up to the rear of train No. 56. The foreman was stationed on the north side of the cars and at the place where the coupling of the Pullman to the last car of train No. 56 was to be made. It was his duty to attend to that coupling. Olson, the switchman, was also on the north side of the train and took his position at the east end of the Chicago express car and the west end of the Milwaukee baggage car. It was his duty, assisted by the decedent, to uncouple the express car from the baggage car so that the former might be taken to the head of train No. 56. The decedent was on the south side of the cars at the place where the cars were to be cut. Just what duty he was performing at the time he was injured does not clearly appear. Olson was the only witness who testified regarding decedent's movements and position immediately before the accident. The decedent never regained consciousness after the acci-

dent, so never was able to make a statement. The express and baggage cars were connected by standard automatic couplers, an air hose, a steam hose, a signal hose, which were parts of the air brake, heating, and signaling systems, and by two heavy safety chains which prevented the breaking apart of the train in case the automatic couplers for any reason became uncoupled. The uncoupling operation first required that the air hose be broken. This was accomplished without much difficulty shortly after the foreman up ahead had released the air hose from the Pullmans and the Milwaukee baggage car. The air was released from those cars by Olson's closing the angle cock at the east end of the Chicago express car and by the foreman's opening the angle cock on the front of the Pullman. Olson testified that he himself broke the air-hose connection, and at that time the decedent was standing about two feet from the south rail. Just who disconnected the safety chains, the steam hose, or the signal hose on the night in question does not appear. Testimony was adduced tending to show that it was the practice of the decedent and of some of those who had theretofore assisted in the work of uncoupling the two cars to shut the angle cock on the westerly end of the Milwaukee baggage car, although this duty was sometimes performed by the rear brakeman of train No. 56. The next act was to release the automatic couplers. This was effected by Olson's signaling the engineer to slack back so that he might pull or release the pin lock. Olson testified that he signaled the engineer to slack back, that he then pulled the pin, and then signaled the engineer to go ahead; that almost immediately upon the parting of the cars he saw the decedent fall between the rails. Subsequent examination revealed that nearly all of the bones of decedent's head were crushed. The heavy safety chains mentioned were attached to the cars by equally heavy immovable clevises, the ends of which, when the slack

between the cars was taken up, were six to eight inches apart and directly opposite each other. The decedent wore a cap at the time he was injured, and it was subsequently discovered that there were well-defined rust marks on each side of his cap which tended to show that his head was crushed between rusty iron objects. No testimony was adduced reasonably tending to show how the decedent's head could have been crushed in any manner other than by the clevises. The photographs and the model afford no other explanation. This statement of facts is, we believe, sufficiently comprehensive to make the issues clear.

It is conceded that the action was properly brought under the Federal Employers' Liability Act (45 USCA, §§ 51–59), since the switching crew was performing an act in furtherance of interstate commerce. That statute in part provides:

"Every common carrier by railroad . . . shall be liable in damage . . . for . . . death resulting in whole or in part from the negligence of any of the . . . employees of such carrier."

The defendant first contends that the court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict. Those contentions may be considered together. It is well established that an employee who seeks recovery from a railroad for injuries sustained by him, or where recovery is sought for the death of an employee, under the provisions of the Federal Employers' Liability Act, negligence on the part of the railroad which in whole or in part caused the injury or death, must be affirmatively established. *Seaboard Air Line Ry. v. Horton,* 233 U. S. 492, 501, 502, 34 Sup. Ct. 635; *Southern R. Co. v. Gray,* 241 U. S. 333, 339, 36 Sup. Ct. 558; *New York Central R. Co. v. Winfield,* 244 U. S. 147, 37 Sup. Ct. 546; *Erie R. Co. v. Winfield,* 244 U. S. 170, 172, 37 Sup. Ct. 556; *New Orleans & N. E. R. Co. v. Harris,* 247 U. S. 361,

367, 38 Sup. Ct. 535; *Rupert v. Chicago, M. & St. P. R. Co.* 202 Wis. 563, 232 N. W. 550; that no presumption of negligence should be indulged because of the fact that an accident has occurred, *Patton v. Texas & Pacific R. Co.* 179 U. S. 638, 21 Sup. Ct. 275; that the doctrine of *res ipsa loquitur* does not apply to such actions, *Patton v. Texas & Pacific R. Co., supra;* that verdicts must rest on probabilities not on bare possibilities, on reasonable inferences rather than on speculation and conjecture. *Samulski v. Menasha Paper Co.* 147 Wis. 285, 292, 133 N. W. 142. These propositions are all well established.

The defendant argues that the plaintiff did not meet the burden of showing to a reasonable certainty that decedent's injuries and death were caused by or resulted in whole or in part from the negligence of the defendant. The only causal negligence found by the jury was that of Olson, the plaintiff's fellow servant. If Olson, under all of the circumstances, was properly found to have been negligent, and if such negligence resulted in whole or in part in the injury and death of the decedent, then the plaintiff is entitled to recover under the federal act.

Without reciting at length the testimony adduced upon the trial, we conclude that the jury was reasonably warranted in drawing the following inferences: The decedent was an experienced, efficient, and careful railroad employee. Just prior to, and at the time he was injured, he was performing work which it was his duty to perform. His injuries were such as clearly to indicate that his head was caught and crushed between either the heavy clevises attached to the cars or the heavy links of the safety chains attached to them when the engineer, pursuant to Olson's signal, slacked back to permit the coupling pin to be pulled and the couplers to be released. The decedent, at the time his head was caught between the clevises or the chains, was in a stooping posture between the cars and engaged in doing work which reasonably required

him not only to be between the cars but to assume a stooping posture. Decedent, at various times while assisting Olson in the uncoupling operation, broke the air hose and closed the angle cock on his side of the car. Decedent closed the angle cock on his side of the car before he was crushed. The foreman of the switching crew had given decedent no instructions as to just what he should do or should not do to assist Olson in uncoupling the cars. The decedent was not intermeddling. It was the practice of decedent and also the practice of some of those who, as members of the switching crew, had theretofore done the same work, to assist Olson, or whoever was doing the work of uncoupling the cars. Olson did not warn the decedent that he was about to signal the engineer to slack back, and did not wait for any word from the decedent, as he had sometimes waited, until he knew that the work decedent was doing was completed. Olson knew that decedent had on former occasions gone between the cars and assisted in the work of uncoupling them. Train No. 56, on the night in question, was fifteen minutes late, and train No. 57 (westbound) was about due. The work of the switching crew was being dispatched as rapidly as was reasonably possible. All of these inferences, in our view, were reasonably permissible from a fair and impartial consideration of the evidence, and these inferences in our opinion support the verdict. Defendant's first contentions, in our opinion, are without merit.

The defendant next contends that the court erred in failing to submit to the jury a question relating to decedent's assumption of the risk involved in uncoupling the cars and in going between them, since he knew all about the conditions and dangers incident to that particular operation. While the decedent was familiar with the uncoupling operation and all of the movements and acts necessary to accomplish it, he did not assume the risk of the negligent acts of his fellow servant. *Hackett v. Wisconsin Central R. Co.* 141 Wis.

464, 124 N. W. 1018; *Reul v. Wisconsin Northwestern R. Co.* 166 Wis. 128, 163 N. W. 189; *Kalashian v. Hines,* 171 Wis. 429, 177 N. W. 602; *Chesapeake & O. R. Co. v. De Atley,* 241 U. S. 310, 36 Sup. Ct. 564; *Chesapeake & O. R. Co. v. Proffitt,* 241 U. S. 462, 36 Sup. Ct. 620. In the *Kalashian Case, supra,* it was said:

"The failure to submit the question of assumption of risk was not error. The negligence . . . was that of a fellow servant of plaintiff. As to such negligence there is, under the federal law, no assumption of risk by a coemployee, until at least actual knowledge of such particular negligence is brought to his attention, or it is so obvious that the ordinarily prudent person would observe it."

In *Illinois Central R. Co. v. Norris* (C. C. A.), 245 Fed. 926, 930, it was said:

"Nor did the deceased assume the risk of such signal being carelessly given. We may well accept the statement that each employee, in switching operations, was to look out for himself, and yet a brakeman could not be said to have assumed the risk arising from the negligent conduct of the conductor. The brakeman was not chargeable with notice that his fellow employee would violate a rule or a custom. He had reason to believe the conductor would not move the train while he was between the cars. If, as the conductor said, it was his duty to look out for the brakeman as much as possible, the brakeman had a right to assume that such duty would not be violated."

There is no testimony which brings this case within the rules of such cases as *Molovasilis v. Chicago, M. & St. P. R. Co.* 179 Wis. 653, 191 N. W. 582, and *Zarcone v. Payne,* 176 Wis. 240, 186 N. W. 415, which held that, "where the negligent conduct of a coemployee is of such frequent occurrence as to charge persons of reasonable care and prudence with knowledge that it is dangerous to work with him, and the coemployee, notwithstanding such knowledge, continues in the employment without protest, he assumes the risk arising from the negligent practices of his fellow servant."

The defendant next contends that the court erred in framing certain questions of the special verdict. It is argued that the questions as framed assumed that the decedent was between the cars at the time Olson signaled the engineer to slack back. Under the facts of this case, we cannot believe that the defendant was in any way prejudiced by the form of the questions. Less than five seconds intervened between the giving of the signal and the slacking back. Decedent must have been between the cars when it was given. He was obviously in a stooping position and doing some part of the work when his head was crushed.

The defendant finally contends that the court erred in not granting a new trial because the verdict as rendered was perverse. The defendant argues that it was the duty of the decedent to exercise ordinary care for his own safety, and that his act in going between the cars was negligent and as a matter of law a contributing cause of the accident. It is our opinion that the jury was justified under the proven circumstances in concluding that the decedent was not negligent. Clearly, if Olson had warned him or awaited word from him that his work was completed before signaling the engineer to slack back, the unfortunate accident would not have happened.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on March 31, 1936.